Good morning, Your Honor. Good morning, Mr. Tobin. You may proceed. Thank you very much. Good morning. May it please the Court. I'm Daniel Tobin. I'm here for Defendant Appellant PNC Bank N.A. PNC believes that the Fourth Circuit should find in its favor on either of two independently sufficient grounds. One, that by application of common law contract principles, Mr. Lyons became bound by the arbitration agreement that's at issue as of its effective date on February 1st of 2013. And then second, because the language of the relevant amendments to the Truth in Lending Act and Dodd-Frank do not reach this particular agreement. So I'd like to start with the contract issue, if I may. And the Court's, of course, aware that there's a factual sequence that's important here. There's a residential mortgage credit transaction that took place in 2005. Mr. Lyons obtained a home equity line of credit. Mr. Lyons elected to enter into a different kind of relationship with PNC five years later. Counselor, if I could interrupt you, both parties have briefed this very well and helped me at least get here. So I'm going to kind of go straight to one of the statutory issues. Do you, is the way you believe, the way your client believes the arbitration provision should work, would it bar Mr. Lyons from bringing an action in an appropriate district court in the United States? Well, no, Mr. Lyons did, in fact, bring an action in the District Court of the United States. So he was entitled to do that. But isn't the way you seek to use the arbitration provision to prevent that action from proceeding in district court? Well, right, and the reason that PNC takes that position is because this arbitration agreement is not covered by the provision of 1639C that you're referring to. Well, I know that, but I understand that argument. But under the text of that provision, it says that no other agreement relating to, and we could debate relating to, and that, I suppose, is your argument. But the effect of what you're trying to do with the arbitration provision would, in fact, bar Lyons from bringing the action in a district court of the United States, correct? Well, there's no question, Your Honor, that the Dodd-Frank amendments to TILA, where applicable, require that consumers be permitted to bring actions in federal court and that they not be subjected to arbitration. Mr. Tobin, as a follow-up on Judge Quattlebaum's question, the arbitration provision became effective on February 2013. But is it not true that it didn't become binding until the opt-out period expired, which would be June 11, 2013, 10 days after Dodd-Frank's was enacted? That is not correct, Your Honor. And the reason that's not correct is because, as the court has consistently applied, the purpose of construing a contract is to effectuate the intentions of the parties. And the first task for the court is to review the language that the parties used, and if unambiguous, to apply it. And here we've got language that says, this arbitration will apply to you as of the date your account was opened, or if you were an existing customer, as of the date of this agreement, which is February 1, 2013. The cases that were cited by Mr. Lyons in his briefs addressed a different set of facts, one that is decided by the same principle, but those facts were as follows. I'm thinking of the Gupta case, but the other cases that they cited had the same facts. And that is this. Employer sends to employee an amendment to a contract that says, as of 30 days from now, we're going to arbitrate any disputes. And you have until then to opt out. So that contract says, we're specifying an effective date, it's later, and you can opt out until then. So the court didn't have any problem concluding, okay, the effective date is as written, October 2nd, and because there is no opt out, it applies. Here, same principles, you have to read the contract as written. And as written, it says the effective date for existing customers, which Mr. Lyons undisputedly was, is February 1, 2013. So the opt out period doesn't count. It doesn't, and the reason for, I'm sorry. I'm going to say it doesn't mean anything in your view. No, I disagree. Contracts very frequently contain termination provisions. They very frequently contain opt out provisions. If we enter into a contract that calls for either party to terminate after a period of time or upon an event, that can happen and the contract can terminate. That doesn't mean the contract isn't enforced during all those months. And that's precisely the facts that we're dealing with here. Counsel, just another, I got two questions for you related, I guess, really to the 2010 account, where it seems like that effective date is potentially a bigger deal, assuming we have jurisdiction over that issue. But I don't think either side argued this or addressed it, or if I did, I'm sorry. But, you know, 14C3 says that a provision of the Dodd-Frank for which regulations have not been issued 18 months after the designated date take effect on that date 18 months later. And that date, 18 months, I think, is January 21st, 2013. And so I don't think by that time regulations had been taken effect or had been finalized. So why aren't we looking at that date, January 21st, 2013, as the operable date rather than the date of the subsequent regulations? It seemed like the 18 months expired, the regulations weren't final, so by statute we should be talking about that date rather than the date of the regulations. Your Honor, the Bureau, as I understand it, addressed this explicitly by issuing guidance first to indicate that it would issue a final rule that would set the date. It accepted notice and comment, received a lot of comments, and then issued its final rule that set the date at June 1st of 2013. So you think the Bureau's actions, you know, essentially said even though we haven't done the regulations yet, I mean, it seems like that would undo the language of the statute to me, but, you know, I'm not, I'll ask them that maybe. Well, Congress assigned to the CFPB the duty to set an effective date. And I think that was an important consideration on Congress's part. It wanted the agency that was going to have responsibility for enforcing this statute to determine when, and I think that's an important point on the retroactivity issue. Congress clearly did not want this statute to operate retroactively because it wanted, in fact, it didn't even want it to operate prospectively until the Bureau had an opportunity to enact the regulations. So I think that the Bureau did act reasonably in taking its time. It was a very complicated process in taking in all that information. And I think that given the fact that Congress did intend for the Bureau to have this power, that the court should defer to the Bureau's actions in setting the date. And I don't want to beat this to death because maybe I'm the only one focused on it. But I understand that. But it also had the provision I said that if they didn't do it within a certain date, those provisions take effect at a certain time. It seemed like you're right. They gave the Bureau the opportunity to set dates, but they kind of had a hammer, you know, if you will, that you got to do it by a certain deadline or the date we set is going to apply. Am I wrong there? I mean, I may be. I may be missing the boat. Well, the only thing I would say on that, Your Honor, is that, and this is something that this court recognized in the Santoro case, which is a very interesting analogous case involving an anti-arbitration provision within Dodd-Frank, that it's the job of the court to not always simply apply a literal meaning to a statute, but to take into account the context in which that's been enacted. And here the context clearly is that we're dealing with a very complicated regime, a lot of new requirements being imposed by Congress, and the Bureau being assigned the responsibility to determine when that's going to be effective. And I think that given that context and given all the history that took place during the regulatory process, that, yes, the court should treat the effective date that the Bureau assigned because Congress gave it that power as the date that's controlled here. Go ahead, sir. We'll finish up with Judge Qualibon. We had something that you mentioned Santoro. Of course, that was a whistleblowing case, but. Well, actually, I think it was not a whistleblower case. Not a whistleblower. Which was exactly why the court found that the Dodd-Frank provisions would not apply, even though, I mean, the language that Mr. Santoro was using from Dodd-Frank was very literal and very clear that an employment agreement that doesn't contain this carve-out is not enforceable. That's what the statute said. And this court looked at that and said, well, but what we're regulating here, what Congress was attempting to regulate here was whistleblower claims. This is not a whistleblower claim, so we're not going to apply it to that. And I would think that that addresses Judge Qualibon's concern. Mr. Tobin, let me go back. You're saying on terms of the arbitration clause, the way you read it, you're saying that if you're an existing customer, you get no opt-out. No, he could have opted out. He could have opted out. And how long did he have to opt out? Well, he had multiple opportunities to opt out. How long? How long would it extend to him? The date that Judge Floyd gave initially was correct. He was given until June 11th. But the contract says that the effective date is February 1st, and that means that between February 1st and June 11th, the contract was in effect. And because Mr. Lyons never opted out, it remained in effect thereafter. But what happened in between was Dodd-Frank, didn't it? Before his time expired for opting out, the law changed. Yes, sir. But the effective date had already begun running because he's an existing customer. No, it says the effective date will be the date of your agreement if you're an existing unless you opt out without providing proper notice as set forth here. So unless means you're changing the effective date. It would have to mean that. Your Honor, I disagree. But that's what it says. That's what it says. But that language simply gives to Mr. Lyons the power to terminate the contract, to opt out of it. It doesn't change the effective date. No, it does. It says if you're an existing customer, the date of, you know, it says the effect of this arbitration division will be as of the date of this agreement. Okay, that's given the effective date. Unless you opt out. So then it wouldn't be effective until his time for opting out expires, would it? I don't think so, Your Honor. First of all, obviously he did not opt out. Even if he did opt out, it would have been in effect until he did opt out because of the plain language of the agreement. So it isn't an offer and acceptance situation. He's an existing customer. They have an account agreement. It's in effect. And it's been amended by PNC in accordance with its rights under the agreement. And the opt out is simply a termination clause that can come into effect later but didn't. It doesn't change the effective date. I see that my time is up for the first. All right.  Ms. Novick. It pleased the court. PNC is trying to evade Dodd-Frank's restrictions on arbitration in the home lending context in two ways. First, PNC claims that Dodd-Frank's ban doesn't apply at all because the arbitration clause is in a separate deposit account agreement. But that doesn't matter because Dodd-Frank expressly states that a provision in the agreement that relates to the home loan is covered by its restrictions. And then second, PNC tries to sidestep Dodd-Frank by arguing that the arbitration clause should not be used to arbitrate in 2013. But the 2013 arbitration agreement was actually formed ten days after Dodd- Frank went into effect and has been superseded by many other post-Dodd- Frank agreements. Counsel. I want to give you plenty of time to talk about the merits and I appreciate those. But with respect to the district court's order compelling arbitration related to the 2010 account, how do we have jurisdiction over that based on Section 16B of the Federal Arbitration Act? Your Honor, this court has pendent appellate jurisdiction because the district court's partial grant of the motion to compel is inextricably intertwined with the court's partial denial of the motion to compel. It's based on the same subject matter, same legal questions. And specifically, PNC's argument on appeal is that the 2013 arbitration agreement requires Mr. Lyons to arbitrate all of the TILA claims. Mr. Lyons' response is that the 2013 arbitration agreement is entirely unenforceable. So there's no way for this court to decide the appeal without also deciding that cross-appeal issue. I think Your Honor's concerned particularly about Section 16B, which says orders compelling arbitration are not appealable. Right. And I've looked through the pendent jurisdiction cases and I certainly may have missed this, but I'm familiar with that. But I'm not familiar with one where we have an express specific bar to jurisdiction like this. I mean, normally you have an order that is appealable and you have one that may not be. It may be interlocutory or something like that. And you have a general statute saying those orders aren't appealable. But here 16B is specific and express and, you know, I realize they're very connected. It's the same people and it would make matters complicated. But I can't see why not appealing the order on the 2010 account prevents us in any way from effectively addressing the 2014 account. I mean, again, it's a mess. I can see the complications that might ensue, but I'm not sure that those overcome an express jurisdictional thing like this. Your Honor, there are cases that have done that. The Second Circuit, Ninth Circuit, and D.C. Circuit, as well as the Eighth Circuit in DICTA suggested they would, have all held that Section 16B does not restrict pendent appellate jurisdiction. Okay. And those decisions and those cases are all cited within the jurisdiction section of PNC's reply brief. And importantly, those cases make sense because Supreme Court has repeatedly said that Congress legislates against the backdrop of common law principles. And pendent appellate jurisdiction is all about when the court can assert jurisdiction over non-appealable issues, over issues that normally it can't assert jurisdiction over. And so, because there's no express prohibition, there's nothing in the statute that suggests Congress is trying to override that common law principle of pendent appellate jurisdiction. All of those circuits have held that 16B does not prohibit or restrict pendent appellate jurisdiction with respect to motions to compel arbitration. Ms. Noble, let me ask you, given that the initial account agreement included the right to amend, why would the subsequent agreements be considered new contracts? Your Honor, that's just a matter of Maryland law. Maryland law has repeatedly held that any time you modify a contract, even if you're pursuant to a notice procedure, that is a formation of a new contract. It's a new meeting of the minds. You can see all of the citations to Maryland law on page 7 of the reply brief. And that means that every modified version of the account agreement, including the 2015 agreement, which actually modified the arbitration clause in particular, are new versions that apply. And because they're new post-Dodd-Frank versions, under Maryland law, when a contract is formed, existing law at the time becomes incorporated into that contract. Well, does Maryland distinguish between amendments and novations? Your Honor, I think actually not. Repeatedly they have used the word novation, like in the Berman case, coinciding with the term revision of an agreement. Regardless, I think this would also meet the standards of a novation. But either way, it's a modification of a contract is the language used in the creation of a new contract. In fact, in John Deere, the Maryland Court of Appeals actually held that when you have an open-ended contract that can be renewed, so a party has a choice like every 120 days to renew it, it's actually a series of 120-day contracts, and that whenever it's renewed, whatever law then exists at that time becomes incorporated into the contract. And that's exactly what the Maryland Court of Appeals held in John Deere. And so for that reason, this court doesn't even need to get into the weeds of the 2013 arbitration agreement's formation date because it was clearly superseded by lots of subsequent contracts that are subject to Dodd-Frank. If this court did get into the weeds, though, it is very clear that the Dodd-Frank went into effect. The June 11th is the opt-out deadline. PNC continues to quote the language from the arbitration agreement but then leaves out the clause starting with unless. It says it'll apply starting on February 1st, 2013 unless Mr. Lyons opts out. PNC is conflating the time frame that's covered by the arbitration clause once an agreement is formed with the date of actual formation. Under Maryland law, there is no contract if there is no binding obligation. And if a dispute had arisen in April 2013, Mr. Lyons would not have been obligated to have any binding obligation to arbitrate that because his deadline to opt out still hadn't passed. Maryland Court of Appeals and many circuit decisions have recognized that when that opt-out deadline passes, that's when the agreement becomes binding and that's when the agreement is formed. Another way to think about it is just like there's an offer on the table and it's not accepted until Mr. Lyons fails to opt out by the necessary time period. But counsel, I mean, you could do that, right? I mean, you could say we don't have a binding agreement until June 11, but the agreement I make on June 11 is that the effective date will precede when I said. Isn't that pretty much what PNC is saying? Your Honor, you're absolutely right that you can contract to commit yourself to arbitrate disputes that arose in the past. The problem is what matters here is the date of formation because Dodd-Frank went into effect before that time. And under Maryland law, when a contract is formed, the existing law at the time under John Deere is incorporated into that contract, almost as if it was expressly included. So that means that, yeah. Yeah, I understand. Thank you. Let me, could you address the question I raised about why, I mean, I appreciate this is a complicated statutory regime, but why are we even talking about these June dates based on 14C, I can't read, C3, which says if you don't have it in effect within 18 months, the statute goes into effect on that date. Your Honor, I actually believe that this is discussed on page 9 of our opening brief, that the CFPB issued the final rule the day before, on January 20, 2013. Okay. It's confusing based on the date on the document, but they explain that it was released on the day before that date came through. Okay. So it was released within the 18 months. I appreciate that clarification. Thank you. Moving to the other question regarding the scope of Dodd-Frank, PMC tries to avoid Dodd-Frank's restrictions on arbitration altogether by pointing to an arbitration clause in a separate deposit account agreement. The easiest way to affirm the district court here is on Section 1639CE3. Because that E3 provision expressly prohibits any provision in an agreement relating to a home loan from being applied or interpreted so as to bar consumer from bringing a federal claiming court. And here, the deposit account agreement clearly relates to Mr. Lyon's home loan because according to PMC, that account agreement provides a means by which the bank can collect payments on the home loan. Okay. PMC argues that the two are unrelated, but the basis of PMC's motion to compel was that Mr. Lyon's TILA claim, which is alleging unlawful collection on a home loan, arises out of or relates to the deposit account agreement. That's on JA101. So PMC cannot claim that the account agreement and the home loan are related to the purposes of compelling arbitration, but then say they're not related in order to dodge statutory restriction on arbitration. In addition, the characterization that PMC makes that this is just about a waiver of statutory actions and not about arbitration is an interpretation of E3 that no court has accepted. It also isn't consistent with the text or structure of the statute. E3 appears under a subsection heading entitled arbitration. PMC relies on cases that talk about when a statute authorizes a court, sorry, authorizes a plaintiff to bring a cause of action in court and says that doesn't preclude arbitration. But here the language is very different. It's an express prohibition of waiving the right to bring your claim in court. Indeed, it almost directly matches the language of the Supreme court used in glimmer when describing how Congress could go about and overriding the FAA and the FAA. So it's a very different interpretation in certain contexts. E3 is therefore the easiest way for this court to affirm the district court below, but we also think the court could affirm under E1 which says home loans cannot include mandatory arbitration agreements. And here the account agreement purports to actually amend key terms of the home loan, like the collateral and the means of collection on that home loan. It would be a massive loophole in the statute. If the, they could simply stick terms in separate documents to get around restrictions in Tila. I think finally, we believe there's no reason to consider the retroactivity of Dodd-Frank given that the 2013 agreement postdates Dodd-Frank and has been repeatedly superseded by Dodd-Frank account or post Dodd-Frank account agreements. Nonetheless, in our briefing we outlined several reasons why even if there was a valid pre-Dodd-Frank arbitration agreement, applying Dodd-Frank's arbitration restrictions here would not be impermissibly retroactive. If the court has any questions on those arguments, I'm happy to answer them, but otherwise we'll rest on our briefs there and I'll reserve the remaining time for rebuttal. Thank you so much, Ms. Noble. Mr. Farrell. Good morning, Your Honor, Kevin Friedel for the Consumer Financial Protection Bureau. And I want to start by addressing Judge Quattlebaum's astute point about the timing issue here that the dates here, because I think it's not entirely clear unless the court also keeps in mind another rule not cited in the parties briefs, but so the Bureau issued a procedural rule in 2012. This can be found in the Federal Register. It's 77, the Register 76-353 and what that procedural rule said is for purposes of the statutory deadline here and similar deadlines for rulemaking elsewhere in Dodd-Frank. What was meant by issuance is when we, the Bureau published a rule on our website, not the date that it is then later appears in the Federal Register. So this rule, implementing the arbitration restriction was issued January 20th, 2013. So within that 18 month deadline, and that's why I think it's appropriate to look at the June 1st effective date that the Bureau set in that rule. I want to take a step back just to be as helpful as I can try to clarify the issues that the Bureau is addressing here at Zemeckis Curat. So our position can be summarized briefly. First, we think the arbitration restriction applies here because the arbitration clause that the bank seeks to invoke is contained in a contract that relates to the plaintiff's home loan under 1639 C or E C3. I'll just call that paragraph three going forward. If I could second, we think that the plaintiff can rely on that arbitration restriction at least as to the 2014 account because all of the potentially relevant events there took place after the statute took effect. And then finally, we haven't taken a view on the same sort of timing issue with respect to the 2010 account. A resolution of that issue in this case turns on the number of very fact specific issues, including the parties specific arguments about waiver and estoppel based on what happened in the district court. The appellate jurisdiction questions that Judge Pavlov has raised. And so we haven't weighed in there. What I would say though, is when the bank claims in its reply brief that the Bureau agrees with them on any issue that it hasn't specifically addressed, that that's incorrect or shouldn't credit that. Yes, Judge Paul. Does the Bureau have a position on the retroactive application? Of the provision that you do have a position on C3, do you have a, does the Bureau have a position about whether that operates retroactively? We haven't, no, we haven't taken a view on sort of how the court should analyze the, this, this timing question there because we think those questions are only relevant to the 2010 account, the 2014 account. If the court were to look, yes, Your Honor. Yeah. And I'm just trying to make sure my question's clear. I'm not asking whether you have a, you've made it clear you don't have a position on this particular situation. My question is a little more basic. Do you have, does the Bureau have a position about whether C3 operates retroactively? Let's say it was just, there was no question about the arbitration agreement. It was well in before the Dodd-Frank deadline, valid existing contract that preceded anything to do with the Dodd-Frank. Dodd-Frank comes into existence. Say your interpretation is right. Does it operate on previous agreements? We haven't offered a view on that in any other forum as well. So I can just point to what we have in the, in the rulemaking notice. But there's not, there's yeah, there's not some other rule that would speak to that. And, you know, so turning to this issue that really was the focus of our brief, do you think that the deposit account agreement plainly did relate to bankless home loans? It purported to give the bank a means of collecting payment on that home loan, which the bank then exercised. So any sort of uncertainty as to whether that account agreement related to the home loan was definitively resolved by the bank's own actions. And, Mr. Tobin pointed to this court's previous decision in Santoro. We just don't think that that's relevant here because what the plaintiff is trying to pursue is a claim that is about very much about his home loan. So there's no need for the court to interpret this provision to, you know, sweeten other claims that might have no connection to a home loan. And I see that my time has expired. I'm happy to answer any other questions the court might have. Thank you, Mr. Freedom. Mr. Tobin, you have time reserved. Thanks very much, Your Honor. Well, a number of points to make, and I guess first I'd like to thank my co-counsel for being better prepared on Judge Quattlebaum's question than I was. I appreciate that information. And I apologize, Judge Quattlebaum, for not having that information. I have no issues. Thank you. Thank you, sir. I would like to address this contract formation question, which I think is very interesting. And there is Maryland law that's very germane to this point. There were two cases that were decided, Cheek and then Holman, that addressed whether after the fact arbitration agreement is enforceable. And the first of those, Cheek, as I recall, found that if the party that is in PNC's position and is now requiring arbitration of disputes, retains the power to terminate it at any time, then that's an illusory promise and we don't have a contract that's not enforceable. And in Holman, the subsequent case, the court said, but if the promises are mutual, if both parties are bound to the arbitration agreement, there is consideration that we have a binding agreement. That's precisely the case here because effective February 1st of 2013, there is a binding mutual obligation on the part of PNC and Mr. Lyons to arbitrate any disputes that occur thereafter. And PNC is bound by that, which means that Mr. Lyons was entitled to enforce it and demand arbitration for any disputes that occurred at that time. So the contract formed effective February 1st of 2013 could have been terminated thereafter, but the binding contract was formed by that mutual exchange of consideration February 1st of 2013 should be. Mr. Tubman, assume you're right there. How does that help you with respect to the 2014 account? Well, the 2014 account, I'm helped by that because Mr. Lyons was a deposit account customer of PNC in 2010. He was an existing customer in 2013. He became bound to the arbitration agreement in 2013 on February 1st. And because he remained an existing customer thereafter, he's bound for purposes of the 2014 agreement as well. I respectfully disagree with Ms. Noble's characterization of Maryland law. What this account agreement allows PNC to do is to amend its agreement. And amend means amend. It doesn't mean replace. It means correct. It means improve upon. But again, if you're right there, counsel, I mean, if you're right there, there are two accounts, which to me complicates this a little bit. Admittedly, there's one set of terms that apply to the accounts, but I don't see, I mean, even if you are right under contract law, that it's an amendment and not a novation or modification. And even if you're right about its effective date, going back to the contract date, I just don't, if you open up a new account, it seems to me hard to argue. When you open up that account that applies to an agreement, and Dodd-Frank unquestionably is in place by then, by the 2014 account, I don't understand how contract law helps you with a whole new account. Well, Your Honor, because there's a single contractual relationship between depositor and bank that started in 2010, and Mr. Lyons, as part of that two-party agreement, said that as of February 1st of 2013, as an existing customer, I'm bound to the arbitration clause. And there are other references, we include them in our brief, to the definition of accounts. So this applies to, this account agreement will govern your relationship with the bank. This covers account or accounts. So it covers everything, and as an existing customer, he remains bound. I do, that's what I have for that, Your Honor. I hope it's satisfactory, but I do want to address that. No, no, thank you. Appreciate it. Sure. It's satisfactory, but it certainly undermines the purpose of Frank Dodd and the statute passed by Congress to protect consumers. Well, Your Honor, I'd very much like to address that. We're talking about Section 1639C of Dodd-Frank, and that section has extensive new requirements in the area of residential mortgage loan origination. For example, there's limitations on, banks have to make sure that borrowers can repay. You're entitled to a presumption if you make sure it's a qualified mortgage loan. Prepayment penalties are limited. Credit insurance is limited. Negative amortization is prescribed. This is a section that addresses residential mortgage loan origination. PNC has a different kind of relationship with its customers, and that is, it's a bank to its depositors. I mean, it's a lender to its borrowers, such as Mr. Lyons. Mr. Lyons is the debtor, and PNC is the creditor. The shoe's on the other foot when you're talking about a deposit account. PNC is the party that owes the money to Mr. Lyons. So, it's an altogether different relationship. Congress regulates both of these areas. I mean, there's a Truth in Lending Act that gets a lot of attention, but there's also a Truth in Savings Act, 12 U.S.C. 4301. So, what did Congress intend to regulate when it enacted this statute? It intended to regulate residential mortgage loan origination. PNC was not on notice that its use of, its account agreements to offset payments that were due to it were suddenly proscribed by this provision that actually isn't even in the Anti-Arbitration Clause, which is Sub 1. It's rather in Sub 3. We think, Your Honor, that this is, as the Court noted in the Santoro opinion, an elephant hiding in a mouse hole. I mean, if Congress had intended to reach this agreement, it would have said so much more explicitly. Instead... So... Yes, sir. So, counsel, I mean, yeah, I mean, people, it's the trouble with what Congress intended because, you know, everyone can have their views on that and, but, you know, and I, you know, at least respect your opinion, but it seems I don't understand how it, that if we go to the text of C-3, you know, it doesn't specifically address what you're attempting to do with the arbitration agreement. Yeah, I get the contract retroactivity arguments. I mean, those are something, but in terms of just how the text operates, unless relating to has, you know, I mean, maybe that's the hook, but, you know, we got the Supreme Court and this Court has pretty broad language about relating to. And so, you know, it's hard for me to know whether I can truly determine what Congress intended and go on that. But what I can go on is what they enacted. And what they enacted seems like it applies to what, to your use of the arbitration agreement. Right. I respectfully disagree. Congress is clearly trying to regulate mortgage loan origination when the CFPB explained its guidance on this. It said, you have to understand these regulations apply to contracts for residential mortgage credit transaction. The account agreement that PNC entered into with its depositors is not a contract for residential mortgage credit transaction. Nor is it related to it. That's one. That's one. You just, what you were just talking about is subsection one, correct? Four? No, I'm referring to subsection three, though. The section that contains the related to language. Okay. I thought you were saying, using the word four and I thought that was in subsection one. I'm sorry, Your Honor. I'm not referring to the regulation that the Bureau enacted in order to enforce the statute. Okay. So there was a question, okay, so how far do we go? How far a field of the mortgage note is this supposed to go? And the Bureau said, you need to understand, sometimes at a loan closing, lots of documents get executed. So you can't just, a creditor can't just stick an arbitration requirement in an ancillary agreement at a residential mortgage credit transaction. This is not, five years later, any part of residential mortgage credit transaction. And for that reason, it's not part of what's being addressed by the statute or by the IRS. My time is long up, Your Honor. I'll be glad to answer any of the questions. All right. Thank you, Mr. Tolman. Thank you. Ms. Noble, you have some time to answer. Thank you. If I could first start on the question of when the 2013 arbitration agreement was formed. PNC argues that they were, there was mutually binding obligation to arbitrate starting on February 2013. But if you look at JA 147 in the district court briefing below, PNC stated just the opposite. They stated that there is no binding obligation to arbitrate until the opt-out deadline passed on June 11th. In addition, that has to be true because under Maryland Court of Appeals law, it is the acceptance of a modification of an agreement is when that time period to opt-out runs dry. If they were bound starting on February 2013, there would be no point of putting the language unless you opt-out into that arbitration agreement. So because the arbitration agreement was formed after Dodd-Frank case went into effect, it necessarily incorporates the arbitration restrictions outlined in Dodd-Frank. Second, it has repeatedly been superseded by additional agreements. To argue that this applies to the 2014 account that was opened makes no sense because Mr. Lyons was told to sign a whole different agreement in 2014 when he opened that account. And then that arbitration provision was actually amended in 2015. There can't be eight different arbitration agreements or sorry, eight different account agreements that all apply at once. And under Maryland law, when there's any modification to a contract, even pursuant to a notice provision that's in a prior contract, that is a new meeting of the minds, a new formation of a contract. And that means, again, the law that applies at the time attaches as an integrated into that contract. Finally, on the question regarding the scope of Dodd-Frank, DNC is simply trying to write out the language that's related to from the statute. DNC continues to focus on whether or not it's part of the transaction. But that's why there's a separate provision, the E3 provision, applying to any document related to. Here, the account agreement purports to provide a means of collecting money owed on a home loan. And that's the entire claim that Mr. Lyons alleges below. A TILA claim alleging unlawful collection on a home loan. It's precisely the kind of situation that E3 is designed to apply to. In conclusion, this court should affirm the district court's partial denial of the motion to compel. Specifically, this court should hold that the E3 provision restricts arbitration clauses in agreements relating to home loans and that the deposit account agreement relates to Mr. Lyons' home loan because it purports to provide a means of collecting payments on it. This court should also reverse the district court's position on the grounds that the 2013 account agreement actually postdates Dodd-Frank by 10 days and has been repeatedly superseded by other post-Dodd-Frank account agreements. This court should not allow PNC to write an exception into a remedial statute like TILA that is not based on the text or the structure of the statute. Indeed, if PNC can sidestep Dodd-Frank's arbitration restrictions here, its conduct will be a blueprint for every other bank looking to evade those restrictions or other regulations governing home loans. For those reasons, this court should affirm on the appeal and reverse on the cross-appeal. Thank you. Thank you, counsel. We all appreciate you all being here. Again, we would love to come down and shake your hand if we can, but know virtually that the spirit is the same. We appreciate you being here and we wish you well and stay safe. Thank you so much, counsel. Thank you,
judges: Roger L. Gregory, Henry F. Floyd, A. Marvin Quattlebaum Jr.